DANIEL EDWARD GORMAN & others *vs.* CITY OF PEABODY.

Essex. November 4, 1942. — December 29, 1942.

Present: FIELD, C.J., DONAHUE, QUA, COX, & RONAN, JJ.

*School and School Committee. Municipal Corporations,* Referendum. *Peabody. Words,* "Measure."

A vote of the school committee of Peabody to increase by a stated amount the salary of each school teacher then employed was a "measure" subject to referendum under § 48 of the city charter, Spec. St. 1916, c. 300.

PETITION, filed in the Superior Court by twenty-four taxable inhabitants of Peabody on April 1, 1942.

The case was heard by *Morton,* J.

*J. A. Liacos,* City Solicitor, for the respondent.

*W. J. O'Keefe* of the District of Columbia, (*A. K. Carey* with him,) for the petitioners.

Cox, J. This is a petition brought under G. L. (Ter. Ed.) c. 71, § 34, inserted by St. 1939, c. 294, to have determined the amount of an alleged deficiency for the support of the public schools, not included in the annual budget appropriations for 1942, and to require the respondent and its officers, whose action may be necessary, to carry out such order as may be made relative to any deficiency. The case was tried upon a statement of agreed facts and a further stipulation as to the amount of the alleged deficiency. A final decree was entered establishing the agreed amount of the alleged deficiency and, in effect, ordering compliance by the respondent and its officers with the provisions of said § 34. The respondent appealed.

On October 2, 1941, the school committee of the respondent voted to increase by $200 the salary of each public school teacher then employed, effective January 1, 1942. On October 18, 1941, a referendum petition, signed by the necessary number of registered voters of the respondent, as required by Spec. St. 1916, c. 300, entitled "An Act to incorporate the City of Peabody," was duly presented to the school committee protesting against this vote. The school committee, "contrary to the provisions" of said c. 300, failed to annul, repeal or rescind the vote and failed to request the city council to have "said vote or measure" submitted to a vote of the qualified voters of the city, "as required by the provisions of" said c. 300. On November 6, 1941, at a regular meeting of the school committee, said vote of October 2, 1941, was "reconsidered and re-affirmed." On November 19, 1941, the school committee presented to the mayor its school budget for 1942, which included the amount required to pay the salary increases that had been voted, but the mayor refused to include this amount in the budget and also refused to include any other sum to be used for the payment of the salary increases as voted. The budget, as submitted without these provisions, was approved by the city council.

The city charter of Peabody is found in Spec. St. 1916, c. 300, § 48 of which provides, in substance, that if within twenty days after the final passage of "any measure" by

the city council or by the school committee a petition signed by the requisite number of registered voters is presented to the city council or to the school committee, as the case may be, protesting against "such measure or any part thereof, the same shall thereupon and thereby be suspended from taking effect," and the city council or school committee, as the case may be, shall immediately reconsider "such measure or part thereof," and if "such measure or part thereof" is not entirely annulled, repealed or rescinded, the city council shall submit the same, by the method provided in the charter, to a vote of the qualified voters of the city, and "such measure or part thereof shall forthwith become null and void unless a majority of the qualified voters voting on the same at such election shall vote in favor thereof."

One question for determination is whether the vote of the school committee increasing the salaries of all the public school teachers is a "measure" within the meaning of that word as appearing in said § 48 of the charter. In construing the word "measure" in the phrase, "When the municipal council shall pass any measure," as appearing in St. 1911, c. 645, § 28, it was said in *Thomas* v. *Municipal Council of Lowell*, 227 Mass. 116, at page 120, that it did not include an order of removal of city officers. The case of *Dooling* v. *City Council of Fitchburg*, 242 Mass. 599, was a petition for a writ of mandamus to compel the respondent city council to comply with the municipal referendum law as to certain orders passed by it. At that time the charter of the city of Fitchburg was Plan B of what is now G. L. (Ter. Ed.) c. 43, § 42 of which provides that there shall be a referendum respecting "any measure" finally passed by the city council of cities that have adopted Plan B. "Measure" is defined by § 37 of said c. 43 to be an "ordinance, resolution, order or vote." It was said, at page 601, that these words of definition, although of broad signification, are necessarily limited to subjects vested by law in the city council. "The sphere of action of the city council of a city with Plan B charter is rigidly confined to legislation with possible exceptions not here material, and cannot

encroach upon executive or administrative duties, which are to be performed by the mayor or under his direction or by other municipal boards, committees or officers." It was held that the orders of the city council to which the referendum was sought were clearly executive, and not legislative, in their nature. What the city council did was to adopt orders confirming the action of one of its committees in advertising for and accepting bids for the erection of a school house, awarding contracts in accordance with the vote of the committee, and authorizing and directing the mayor to execute with each successful bidder a described and identified contract. It was held that the passage of these orders was not within the sphere of action vested in the city council and that, not being "measures" within its jurisdiction, the referendum provisions were not applicable to them. (Page 602.)

In *Openshaw* v. *Fall River*, 287 Mass. 426, the plaintiff, a police officer of the defendant, was paid twenty per cent less salary than he had received prior to a given date, and he brought suit to recover the amount of the reduction in his salary. The city council adopted a budget based on a reduction of twenty per cent for all officers and employees of the city, and other necessary steps were taken to reduce the salaries by twenty per cent. It was said that the action taken was legislative in nature, and not executive or administrative (page 432) citing *Alger* v. *Justice of the District Court of Brockton*, 283 Mass. 596, where it was held, among other things, that the provisions of the charter of the city of Brockton giving to the mayor and aldermen power to appoint policemen and firemen, their compensation to be fixed by concurrent vote of the city council, "clearly convey legislative power and contemplate legislative action." (Page 598.) It was pointed out in *Selectmen of Milton* v. *Justice of the District Court of East Norfolk*, 286 Mass. 1, 5, that the exercise of executive functions as to a police officer or fireman with respect to his removal, suspension, transference from office, or lowering in rank or compensation, or abolition of office, taken after full hearing, is in the nature of a judicial investigation, but that such action differs in

nature from a sweeping determination of municipal policy as to the scale of salaries to be paid to all municipal employees or to all employees of a considerable department of the municipal government, which is not a judicial function. See *Rappaport* v. *Lawrence,* 308 Mass. 545, 548.

In *Fortin* v. *Chicopee,* 301 Mass. 447, 448, it was said: "An executive reduction in salary of a single officer or employee in the classified civil service, or of selected individuals in that service, requires just cause, reasons specifically stated in writing and a hearing . . . . Such an executive reduction in salary must be distinguished from legislative action by a municipality, constituting 'a sweeping determination of municipal policy as to the scale of salaries to be paid to all municipal employees or to all employees of a considerable department of the municipal government.'" It is true that the opinion in this case goes on to say that the reduction (in wages or salaries) could not be valid as an executive reduction for want of reasons given in writing and that it must be supported, if at all, as legislative action, affecting the members of the department uniformly. (Page 449.) See *Barnard* v. *Lynn,* 295 Mass. 144; *Whalen* v. *First District Court of Eastern Middlesex,* 295 Mass. 305, 308; *Gilet* v. *City Clerk of Lowell,* 306 Mass. 170, 175.

It may at times be difficult to determine just where the executive function relative to the matter of salaries ends and the legislative function begins. But in the light of the cases to which reference has been made and having in mind the language of the city charter, we are of opinion that the vote in question of the school committee was passed in the exercise of its legislative function. It was a sweeping determination that every public school teacher was entitled to an increase in salary. Apart from economic conditions, in so far as they relate to teachers, it does not appear that the increase had any reference to the individual qualifications, length of service, or other matters which quite generally enter into the consideration of the question whether a salary increase is warranted. If we assume that the increase was based upon the economic condition of the teachers, it does not appear that any consideration was given to the fact,

if it is a fact, that salaries of teachers vary as to amount. The increase, if effective, was available to the highest, as well as to the lowest, paid teacher. We think that the vote amounted to a sweeping determination, as a matter of policy, that the salary of every teacher should be increased. It is true that G. L. (Ter. Ed.) c. 71, § 38, provides that the school committee shall elect and contract with teachers of the public schools, and that it has been held that the provisions of this section, in so far as the making of such contracts is concerned, are not affected by the provisions of G. L. (Ter. Ed.) c. 44, § 31, which provides, in part, that no department of any city or town, except Boston, shall incur liability in excess of the appropriation made for the use of such department. *Callahan* v. *Woburn*, 306 Mass. 265, 270, 273, and cases cited. The decision in the *Callahan* case makes manifest the importance that this court has placed upon the statutory power of a school committee to elect and contract with teachers of the public schools. It well may be assumed that this power to contract with teachers from time to time involves the exercise of an executive function in carrying out the mandate of the law. It well may be that determination of matters of policy may involve executive as well as legislative functions. See *Selectmen of Milton* v. *Justice of the District Court of East Norfolk*, 286 Mass. 1, 5. No attempt is here made to draw the precise line of demarcation between what may be executive and legislative functions, inasmuch as we are of opinion that in the case at bar the vote of the school committee was a "measure" within the meaning of that word as it is used in the city charter.

The petitioners contend that the provision for a referendum in the city charter was not intended to relate to action taken by the school committee in pursuance of its statutory duties. They point out that it has generally been held that the powers conferred upon school committees by legislation are to be safeguarded carefully. As already appears, where one of those powers appeared to be in conflict with the rigid requirements of the municipal finance act (G. L. [Ter. Ed.] c. 44), this court held that the duty imposed

upon the school committee in many respects is paramount. See G. L. (Ter. Ed.) c. 71, § 34, inserted by St. 1939, c. 294; *Callahan* v. *Woburn,* 306 Mass. 265, 273; *Ring* v. *Woburn,* 311 Mass. 679, 686. The petitioners also point out that the language of said § 48 of the city charter is substantially identical with the language contained in G. L. (Ter. Ed.) c. 43, § 42, as amended by St. 1935, c. 68, § 2. Statute 1915, c. 267, enacted in May, 1915 (see now G. L. [Ter. Ed.] c. 43), was an act to simplify the revision of city charters. It contained general provisions in detail that were made applicable to cities that should adopt any of the plans contained therein as methods of city government. Section 42 provided for referendum petitions.

The subject of city charters was investigated by a joint special committee of the Legislature, which filed its report on January 5, 1915. Appended to the report was a proposed draft of legislation upon the subject, which contained in its § 43 a provision for referendum in substantially the same language as that contained in the respondent's charter and in § 42 of said c. 43. In its report, the committee stated that in several of our cities there had been a growing demand in recent years for more coördinate action in matters of finance between the school committee and those city officials who are responsible for the financial affairs of the city, but that those who urged this as important did not in any way seek to break down the independence of the school board, which, within reasonable limitations, had been an established policy in this Commonwealth for years; that there had been so many instances, however, where school committees had attempted to extend their independence to a point that carried them beyond sound consideration of the financial condition of the cities that it had been strongly urged, and the committee believed with justification, that some check should be imposed upon these boards in matters of municipal finances. The committee recommended that the mayor of every city should be chairman, ex officio, of the school committee. It would seem from the report that the committee was of the opinion that, if this were done, the voting members of the committee

would be better informed as to the financial problem of their city, and that it would undoubtedly result in less friction between the school committee and the other branches of the government, without in any way interfering with the conduct of the schools. (Report of the Joint Special Committee on City Charters of 1914, Senate Document No. 254, page 21.) This discussion in the report is followed by a paragraph entitled "Subordinate Departments," in which it is stated that the committee had come to the conclusion that the granting of "home rule" in connection with comparatively minor matters is not only expedient, but right. (Pages 21–22.) This is followed by a brief discussion of the initiative and referendum. One of the recommendations of the committee was that voters may adopt ordinances through initiative and referendum. (Page 11.) The committee pointed out that, while the mayor and members of the city council must be assumed to be representative of the electorate from which they are chosen, it had been strongly urged that any extension of the "home rule" principle would be inefficient if it did not give to the voters themselves the power to hold their elective officers to a strict accountability for their work, and that one effect would be to encourage men elected to city offices "to perform their duties in accordance with the best interest of the citizens as a whole." It was pointed out that the initiative and referendum had come to be regarded as a feature of all modern charters, and that charters granted within recent years had all contained provisions by which the voters of any city might require the passage of "ordinances," even though the city council had not seen fit to do so. (Page 22.)

In the draft of proposed legislation that was submitted with the report, provision was made for an initiative petition requesting the city council to pass "an ordinance, resolution, order or vote," or requesting the school committee to pass "a resolution, order or vote." (Senate Document No. 254, page 46.) When legislation was enacted, it contained provisions for initiative and referendum relative to a "measure" as now defined in G. L. (Ter. Ed.) c. 43, § 37.

(See St. 1915, c. 267, Part I, §§ 38–44; G. L. [Ter. Ed.] c. 43, §§ 37–43.) It seems apparent that the legislation proposed and that enacted went beyond the bare general recommendation that voters may adopt "ordinances" through initiative and referendum. In the draft of proposed legislation and the legislation that was enacted, for obvious reasons, no reference is made to the passing of an "ordinance" by the school committee.

It is to be borne in mind that the charter of Peabody was not adopted under the provisions of St. 1915, c. 267 (G. L. [Ter. Ed.] c. 43). On the contrary, it is embodied in Spec. St. 1916, c. 300. See *Decatur* v. *Auditor of Peabody,* 251 Mass. 82, 84. We are of opinion that the referendum provisions in the charter of Peabody, in so far as they relate to the school committee, of necessity, at least, relate to legislative action on the part of the committee. The referendum provisions in the charter should be given the full sweep intended by the Legislature. *Gilet* v. *City Clerk of Lowell,* 306 Mass. 170, 175.

In 1906, the case of *Morse* v. *Ashley,* 193 Mass. 294, was decided. That was a petition for a writ of mandamus to compel the school committee of a town to reopen a school. The town had voted to reopen it, but the committee had refused to comply with the vote. It was pointed out that the committee had, by statute, the general charge and superintendence of all the public schools, and that in the performance of this duty, the committee acted as public officers; that while they might and should take into careful consideration any wish of the inhabitants of the town, whether expressed in formal vote or otherwise, still, in the end, their own decision, when reached was the decision of the Commonwealth and was to control. "To hold otherwise would be to put the superintendence of the school into the hands of two separate bodies, one the town and the other the school committee, each being likely to neutralize the good effect of the work of the other, and thus to create confusion and inefficiency in the school system." (Page 296.) No question of a referendum was involved. See *Charlestown* v. *Gardner,* 98 Mass. 587; *Graham* v. *Roberts,*

200 Mass. 152, 158; *Brown* v. *City Council of Cambridge,* 289 Mass. 333.

When the Legislature in 1916 gave the legal voters of Peabody the opportunity to determine whether they would accept or reject the proposed charter, it must be held to have been cognizant of the long line of decisions in this Commonwealth that had uniformly upheld the statutory power of school committees, and when the provision for the referendum was inserted in the proposed charter, it was for no idle purpose, nor was it a mere gesture. Provision was made for a protest against a "measure" or any part thereof, the word "measure," in connection with the school committee being defined as a resolution, order or vote. If, despite this referendum provision, the school committee, in the proper exercise of its statutory duties, is supreme, then the referendum provisions can have little, if any, application. Members of the school committee, when elected, become public officers charged with important statutory duties. They derive their power in the first instance from the electorate, and, if the Legislature, in its wisdom, sees fit to provide a reasonable and proper check upon the exercise of their statutory duties, such provisions must be upheld. A comparison with the constitutional provision for a referendum to the people upon any "law" enacted by the General Court that is not expressly excluded affords no help in determining the scope of the referendum provisions contained in the city charter. See *Graham* v. *Roberts,* 200 Mass. 152, 158. Decisions in other jurisdictions to which our attention has been directed, many of which are not in point, are not controlling. See, in this connection, cases cited in *Dooling* v. *City Council of Fitchburg,* 242 Mass. 599, 602; *Monahan* v. *Funk,* 137 Ore. 580; *Dwyer* v. *City Council of Berkeley,* 200 Cal. 505; *Meade* v. *Dane County,* 155 Wis. 632; *Oakman* v. *Eveleth,* 163 Minn. 100; *People* v. *Kapp,* 355 Ill. 596.

The trend toward "home rule," referred to by the committee on city charters in its report, may be exemplified by the provisions of the referendum in the case at bar. When it was decided in *Callahan* v. *Woburn,* 306 Mass. 265, 270–273, that the statutory provision that the school

committee shall contract with the teachers of the public schools is not affected in so far as the making of contracts with teachers is concerned by the provisions of G. L. (Ter. Ed.) c. 44, § 31, no question was involved such as is here raised. The facts in the case at bar present a different question. The statutory provisions as to the powers and duties of school committees, which are of long standing, are to some extent, at least, by the charter provisions for the referendum, made subject to the orderly expression of the will of the registered voters, in so far as a "measure" finally passed by the school committee is concerned. Confining ourselves to the precise question raised by the facts in the case at bar, we are of opinion that the final decree must be reversed, and that a decree must be entered dismissing the petition.

*Ordered accordingly.*