John Stump WITCHER and Donald W. Tyner, Plaintiffs-Appellants,

v.

CANON CITY, a Municipal Corporation; George R. Turner, Mayor; and Councilmen Robert R. Jacobshagen, Donald T. Packard, James W. Baker, John A Rigirozzi, Frederick Roy Whitney, Lloyd O. Leslie, and Robert Bartlett, individually and in their capacities as members of the City Council for Canon City, Colorado; the Royal Gorge Company of Colorado, a Colorado Corporation, Defendants-Appellees.

John Stump WITCHER, Plaintiff-Appellant,

v.

CANON CITY, a Home Rule Municipal Corporation of the State of Colorado; the Council of Canon City; George R. Turner, Mayor; and Councilmen Robert R. Jacobshagen, Donald T. Packard, Frederick Roy Whitney, Randel D. Lesher, Geoffery Ormandy, N. Lamar Todd, and Emily Tracy, in their capacities as members of the Council of Canon City, Colorado; and the Royal Gorge Company of Colorado, a Colorado Corporation, Defendants-Appellees.

Nos. 84SA111, 84SA204.

Supreme Court of Colorado, En Banc.

March 17, 1986.

American Civil Liberties Union Foundation of Colorado, Inc., Brian H. Cole, Denver, for plaintiffs-appellants.

Rothgerber, Appel, Powers & Johnson, James R. Everson, David H. Bate, Denver, for defendant-appellee Royal Gorge Co.

Breyfogle & Mandel, Roger M. Breyfogle, Richard G. Mandel, Canon City, for all other defendants-appellees.

ROVIRA, Justice.

This case is an appeal from the district court for Fremont County, challenging an amendment to the Royal Gorge Bridge and Park Lease entered into between Canon City (City) and the Royal Gorge Company of Colorado (Company).[1] The district court held, on summary judgment, that the amendment was not subject to referendum under either the Colorado Constitution or the City Charter of Canon City, and that the amendment was not unconstitutional under article XI, sections 1 and 2, of the Colorado Constitution. We affirm.

## I.

In 1906, certain lands surrounding and including the Royal Gorge Canyon were conveyed by the United States to the City to be used exclusively for park purposes. The major feature of the park is a canyon cut by the Arkansas River, which is known as the Royal Gorge. In 1929, the City leased a portion of the park to Lon Piper for twenty years, subject to an agreement by Piper to build a suspension bridge across the Royal Gorge (Original Lease). At the end of the term, the City could either buy the bridge from the lessee, or extend the lease for an additional twenty years, at the end of which time the City would own the Bridge without further payment. In 1947, the Company purchased the Original Lease from Piper. After an election in 1949 determined that Canon City residents did not wish to purchase the bridge, the Original Lease was extended for twenty years pursuant to its terms.

The lease under which the Company is presently operating the bridge and park was entered into in 1967, after a second election indicated that the electors did not want the City to operate the bridge directly. Between 1967 and 1981, six amendments to the lease were entered into between the City and the Company.[2] In 1981, the term of the lease was extended, by the Seventh Amendment, to October 31, 2001. None of these seven amendments were submitted to the voters for approval. When the City determined in early 1982 that extensive modernization of the bridge was necessary, and that proposed improvements would extend the life of the bridge for at least fifty years, the City entered into negotiations with the Company regarding the City's role in the cost of the modernization. These negotiations culminated in the Eighth Amendment to the lease in August 1983.

Since the contemplated modernization would extend the useful life of the bridge for at least thirty-one years beyond the expiration date of the Company's lease, the City Council decided to encourage the Company to undertake the long-term modernization by reducing the City's percentage of the tolls collected by the Company from 25% to 20% until 62% of the cost of reanchoring the Bridge or $1,015,412, whichever is less, has been retained by the Company. In addition, the City agreed that the Company will impose a new 2½% fee on concessions and all other retail sales made at the park, 80% of which will be retained by the Company until the Company has recovered the sum of $567,412, which is

1. Plaintiffs filed two appeals to the district court judgment. The first appeal, No. 84SA111, was filed by plaintiffs' trial counsel, who then withdrew from the case, on March 5, 1984. Plaintiff Witcher filed a second *pro se* appeal, No. 84SA204, on April 30, 1984, due to a belief that 84SA111 was filed before the district court's judgment became final. Since the issues in the two appeals are identical, we ordered the appeals consolidated on July 30, 1984.

2. The first amendment extended by one year a moratorium on payment to the City of receipts from tolls, admissions or revenues attributable to new construction. The second amendment altered the percentage rent due to the City on

certain revenues of the Company. The third amendment shortened the period during which the City would receive 25% of certain revenues and authorized an increase in the maximum bridge toll to be charged to visitors. The fourth amendment authorized the company to increase its tolls and charges without prior approval by the City. The fifth amendment clarified certain apparent ambiguities in the 1967 lease agreement. The sixth amendment extended the lease term to October 31, 1988, pursuant to a provision of the lease calling for such an extension if certain capital improvements were made by November 1, 1977.

448

62% of the actual cost of the wind cable system installed in the modernization, with the balance of the new fee to be paid to the City.

Shortly after the Eighth Amendment was approved by the City Council, a number of Canon City residents who did not agree with the decision circulated a petition asking for referral of the issue to the qualified voters of the City. This referendum petition was submitted to the City Council, which determined that approval of the Eighth Amendment was an administrative, rather than legislative, action by the council, and therefore not subject to the referendum power. After the council denied the petition, several residents filed an action in the district court pursuant to C.R.C.P. 106(a)(2) challenging the decision of the City Council that the Eighth Amendment was not subject to the referendum power. They also sought a declaration, pursuant to C.R.C.P. 57, that the amendment violated article XI, sections 1 and 2, of the Colorado Constitution by creating a debt of the City or constituting a gift to the Company.

Subsequently, the Company filed a motion for summary judgment, supported by the affidavit of Walter J. Jenks, president of the Company. In addition to setting forth the history of the Company's relationship with the City, the affidavit stated that the bridge, improvements, and all other facilities at the park will revert to the City at the end of the lease term. It then briefly summarized each of the eight lease amendments, stated that the bridge improvements would leave the bridge "in better than new condition due to advanced technology and materials," and give the bridge, as modified, a useful life of at least 50 years. The balance of the affidavit set forth, in considerable detail, the costs involved in the modification program, the apportionment of those costs between the Company and the City under the Eighth Amendment, and the specific work performed in the modification program. Copies of the 1967 lease, all eight amendments, the Council resolutions adopting the lease and each amendment, and the construction contracts involved in the modification program were appended to the affidavit.

Plaintiffs did not controvert or make any objections to the matters set forth in the Jenks affidavit. After a hearing, the trial court granted the motion for summary judgment, finding that: (1) there were no genuine issues as to material facts; (2) while the Company had an obligation to maintain the Bridge under the 1967 lease, that obligation did not extend to the modernization program undertaken by the Company; (3) modernization will extend the useful life of the bridge to at least the year 2032, well beyond the facility's reversion to the City on the expiration of the lease in 2001; and (4) the City benefited from the Eighth Amendment to the extent that the improvements increased both the useful life of the bridge and the value of the structure.

Relying on *City of Aurora v. Zwerdlinger*, 194 Colo. 192, 571 P.2d 1074 (1977), the trial court determined that the action by the City Council was not legislative in nature and the referendum process does not "apply to administrative or executive matters addressed by a city council." As to the claim that the Eighth Amendment violated sections 1 and 2 of article XI of the Colorado Constitution, the court held that since the uncontroverted evidence established "that there is a life to these improvements that extends far beyond the term of the lease" there was no pledge by the City of its credit nor any donation or grant to any corporation. The trial court reserved the right to alter or amend its judgment, and gave plaintiffs ten days in which, if they were able, to file affidavits controverting Jenks's statement that the modifications will extend the life of the bridge. Plaintiffs failed to do so and, on March 13, 1984, the trial court denied the plaintiffs' motions for enlargement of time within which to file a motion for new trial or motion to alter or amend judgment.

II.

Plaintiffs argue that both the City Council and the district court erred in concluding

that the resolution adopting the Eighth Amendment was not subject to the referendum power. They first contend that the resolution was a legislative act, and therefore subject to referendum under article V, section 1, of the Colorado Constitution. They further assert that, even if the Eighth Amendment was in fact administrative, it remained subject to referendum pursuant to the referendum provisions of the Canon City charter. We deal with each of these contentions in turn.

## A. *The Constitutional Referendum Power*

■ Article V, section 1, of the Colorado Constitution provides, in pertinent part, that

[T]he people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly, and also reserve power at their own option to approve or reject at the polls any act, item, section or part of any act of the general assembly.

. . . .

The initiative and referendum powers reserved to the people by this section are hereby further reserved to the legal voters of every city, town and municipality as to all local, special and municipal legislation of every character in or for their respective municipalities. The manner of exercising said powers shall be prescribed by general laws, except that cities, towns and municipalities may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation. . . .

Colo. Const. art. V, sec. 1. As a reservation of power, the terms of this article are to be liberally construed to effectuate their purpose. *City of Aurora v. Zwerdlinger,* 194 Colo. 192, 195, 571 P.2d 1074, 1076 (1977); *Burks v. City of Lafayette,* 142 Colo. 61, 349 P.2d 692 (1960). In *Zwerdlinger,* we held that the structure of article V made it clear that the referendum provision was intended to apply only to legisla-

tive actions. 194 Colo. at 195, 571 P.2d at 1076; *accord Margolis v. District Court,* 638 P.2d 297 (Colo.1981).

■ On a day-to-day basis, elected city officials are required to make decisions on administrative functions facing the city, such as purchase of city vehicles, establishment of parking fees, and the proper maintenance of city-owned lands and buildings. In *Zwerdlinger,* we concluded that to subject each such decision to referendum would result in chaos and bring the machinery of government to a halt. 194 Colo. at 195, 571 P.2d at 1076; *see also* 5 E. McQuillin, *Municipal Corporations* § 16.55 n. 6 (3d ed. 1981) (collecting cases and noting that the courts "have taken cognizance of the ways in which the conduct of government would be seriously hampered were the initiative and referendum to be used to compel or bar 'administrative' acts by elected officials."). The rule that administrative functions are not subject to referendum is therefore both logical and well grounded in common sense. Moreover, even to the extent that it excludes the referendum, this limitation on the referendum power does not leave citizens without remedy. Citizens who disagree with the manner in which their municipal government is administered are free to elect new officials or recall those who are currently in office. We therefore conclude, as we did in *Zwerdlinger* and *Margolis,* that plaintiffs are only entitled to a referendum if the action of which they complain is legislative in character.

■ In *Zwerdlinger* and *Margolis,* three tests for determining whether a specific municipal act is legislative or administrative were set out. First, actions that relate to subjects of a permanent or general character are legislative, while those that are temporary in operation and effect are not. *Zwerdlinger,* 194 Colo. at 196, 571 P.2d at 1077; *Margolis,* 638 P.2d at 303; *see also* 5 E. McQuillin, *Municipal Corporations* § 16.55 n. 7 (collecting cases). Second, "acts that are necessary to carry out existing legislative policies and purposes or which are properly character-

ized as executive are deemed to be administrative, while acts constituting a declaration of public policy are deemed to be legislative." *Zwerdlinger,* 194 Colo. at 196, 571 P.2d at 1077; *Margolis,* 638 P.2d at 303; *see also* 5 E. McQuillin, *Municipal Corporations* § 16.55 n. 12. Third, if an original act was legislative, then an amendment to the original act must also be legislative. *Margolis,* 638 P.2d at 304. In order to determine whether the resolution in question was legislative or administrative in character, we must apply the first and second tests to the lease amendment, and the third test to the lease itself.

▆ Under the first test, the Eighth Amendment is clearly an administrative act. The language of the Eighth Amendment specifically limits the operation of the reduction in tolls to the period which is necessary for the lessee to recoup 62% of the costs of certain capital improvements made to the Royal Gorge Bridge. Plaintiffs argue that the Council's action will have the effect of raising citizens' tax burdens, so as to offset the decreased bridge revenues. This is pure supposition on the plaintiffs' part, since a city can respond to a decrease in a revenue source in a number of ways, only one of which is to increase taxes. Moreover, plaintiffs' argument begs the issue, for it is one of Council's administrative tasks to expend money to further legislatively declared policies. The question of whether a subsequent measure to raise taxes, resulting from any revenue loss produced by the Eighth Amendment, would be referable is a very different issue that is not before us here. The effect of the Eighth Amendment is the same as that of any other spending decision by the Council, whether for a contract for professional services or for a roof on a police station. It is the administrative task of elected municipal officials to, among other things, collect and expend monies for the protection or enhancement of public properties. As such, the amendment is administrative in character.

Moreover, in the context of a lessor-lessee relationship, changing circumstances often require amendments to an original agreement between parties. In making changes to a lease, neither party presumes an amendment to be permanent in nature or effect. The adoption of the previous seven amendments and the Eighth Amendment itself indicates that the lease is subject to modification as circumstances dictate.

Plaintiffs cite several cases that involve acts which are not analogous to the amendment of a lease between a municipality and a private concern in an attempt to demonstrate that the effect of the Eighth Amendment is permanent or general. For example, *Burks v. City of Lafayette,* 142 Colo. 61, 349 P.2d 692 (1960), involved creation of a special improvement district. There is little doubt that creation of an improvement district is a permanent decision, but there is no logical connection between the creation of an improvement district and the amendment of a lease with a fixed termination date. Similarly, the decisions of this Court, holding that zoning decisions are permanent or general in nature, *see, e.g., Margolis,* are not analogous to the amendment of a lease.

The second test, that an action, in order to be considered legislative, must declare new public policy, also supports the conclusion that the eighth amendment is administrative. Two elections have established the public policy of leasing the bridge, rather than operation of the bridge by the City. The question of approval of the specific terms and conditions of the lease is not a matter of public policy. The negotiation of the leases and the amendments thereto are administrative acts, undertaken to carry out the policy decision to lease, rather than operate, the bridge.

When it was determined that replacement of the existing bridge cable anchors and wind stay system with more modern components would be appropriate in light of both the bridge's condition and developments in the technology of bridge construction since the original erection of the bridge, the Company proposed major capital improvements to the structure rather

than simply repairing areas where damage had been discovered. The City Council determined that this proposal contained a package of improvements which would extend the life of the existing bridge for at least 50 years, resulting in an unencumbered capital improvement for 34 years beyond the term of the existing Lease Agreement.

Plaintiffs assert that the action of the Council was legislative, because it reversed the existing legislative policy evidenced by the Original Lease, the 1967 Lease, and the first seven amendments to the 1967 Lease by providing that the City should bear a portion of the maintenance costs which would otherwise be borne by the lessee. However, that decision did not result in the City's assuming the lessee's maintenance obligation, but rather, it authorized the lessee to make certain capital improvements to the Royal Gorge Bridge that were not provided for in the 1967 Lease. The trial court found that the existing policy that maintenance and repair of the Bridge is the responsibility of the lessee is not changed by the eighth amendment. Since neither the 1967 Lease nor its first seven amendments speak to either the necessity for, or allocation of the costs of, capital improvements made to the structure that exceed the life of the Lease, the trial court's finding is in accord with the evidence.

We also note that the lessee is financing the entire cost of the capital improvements, with the City to receive a reduction of rent equivalent to the costs expended by lessee, for the benefit of the City, and reflecting the actual costs expended on such improvements, exclusive of interest. There is no provision in the Lease Agreement that requires the Company to make capital improvements, particularly improvements determined to have a useful life extending 34 years beyond the term of the Lease.

The action of the City Council carried out the continuing obligation placed upon it to preserve the property of the City and beyond that, chose a method of financing the capital improvements to the bridge without municipal borrowing. Improvements to municipal facilities are specifically provided for in the Canon City Charter, article XIII, section 13:

> The Council may order construction of any building, improvement or facility used or to be used in the operation of any revenue producing facility, plant, or utility, when the cost of such improvement shall be payable out of the revenues of such facility, plant, or utility; provided no bonds shall be authorized, issued or sold to raise funds to defray the cost of such building, improvement or facility, without the approval thereof by the taxpaying electors at a general or special election at which the question of authorization of such bonds shall be voted upon by taxpaying electors.

Since the bridge itself will eventually provide the revenues to pay for the capital improvements, this action is specifically within the discretion of the Council, as no bonds were authorized, issued or sold to raise funds to defray the costs of the capital improvements.

Further, Canon City voters established a clear policy when they twice defeated proposals that the City operate the bridge and park itself. Thus, under the second test, the negotiations for the Lease and its amendments are administrative acts undertaken to carry out the public policy decision to lease rather than operate the bridge and other concessions in the Royal Gorge Park.

Since we conclude that the Lease itself merely carried out the previously established policy of transferring all operational and maintenance responsibilities for the bridge to a private company, and is therefore administrative in character, it is clear that the eighth amendment is also administrative under the third test. Because the amendment is administrative under each of the three tests set forth in *Zwerdlinger* and *Margolis*, it falls outside of the reservation of the referendum power in article V, section 1, of the Colorado Constitution.

### B. *Referendum Provisions of the City Charter*

■ Plaintiffs next contend that, even if the eighth amendment is administrative in

character, the Canon City Charter grants them the right to refer the amendment to the City's electors. Article IX, section 1, of the Canon City Charter provides that "[t]he power to initiate ordinances upon proper petition and refer measures adopted by the council to a vote of the qualified electors, by proper petition, is hereby reserved to the qualified electors of the city."[3] Plaintiffs have seized upon the word "measure" and reason that its usage leads inescapably to the conclusion that the drafters intended the referendum powers to extend to administrative decisions. We disagree.

We note at the outset that the citizens of Colorado cities are free to adopt charters providing for more expansive referendum powers than those mandated by article V, section 1, of the Colorado Constitution. *Margolis*, 638 P.2d at 302; *Zwerdlinger*, 194 Colo at 195, 571 P.2d at 1076; *Burks*, 142 Colo. at 70–71, 349 P.2d at 697. The question before us is therefore not whether the people of Canon City have the power to expand the referendum right, but whether they have in fact done so.

Plaintiffs argue that the distinction between initiating ordinances and referring measures in article IX, section 1 of the Canon City Charter indicates that the referendum power is not limited to legislative matters. In seeking to determine the scope of measures that can be referred, plaintiffs cite several other sections of the Charter in support of the proposition that measures, as used in article IX, section 1, includes the referral of resolutions that are administrative in character. Although we agree that the term "measures," as used in this context, is broader than the term "ordinances," it does not follow that the term is so broad as to include every administrative resolution and every administrative action undertaken by the City Council.

In reading the language of article IX, section 1, we believe that the term "measures" was intended to apply to a wide range of legislative activities. As plaintiffs point out, article III, section 6 of the Charter, entitled VOTE ON ALL MEASURES, provides that "Action of the Council shall be by ordinance, resolution or motion." In light of this provision, the use of the term "measures" in article IX, section 1, indicates that the referendum right under that section extends not only to ordinances passed by the City Council, but to resolutions and motions, as well, provided that those motions or resolutions are legislative in character. *See Greenlee v. Munn*, 262 Ark. 663, 559 S.W.2d 928 (1978) ("measure" defined as "legislation of every character," including any resolution, ordinance, or charter); *Gould v. City Council of Newburyport*, 392 Mass. 302, 465 N.E.2d 258 (1984) (citing statute defining "measure" as including "an ordinance, resolution, order or vote passed by a city council."); *Gorman v. City of Peabody*, 312 Mass. 560, 45 N.E.2d 939 (1942) (referendum right that applied to all "measures" passed by city council or school committee included ordinances, resolutions, orders, and votes); *cf.* 5 E. McQuillin, *Municipal Corporations* § 16.54 n. 15 (3d ed. 1981) (stating that a statute extending the power of initiative and referendum to "ordinances or other measures" includes charter amendments). Indeed, cities often exercise their legislative powers in the form of resolutions. *See Housing Authority of Eureka v. Superior Court*, 35 Cal.2d 550, 219 P.2d 457, 463 (1950) (Shenk, J., concurring and dissenting).

In *Zwerdlinger*, we held that while the Aurora City Charter provided that the referendum power applies to "all ordinances," except listed exemptions, the charter reserved the referendum power only as to "all legislative ordinances." 194 Colo. at 196, 571 P.2d at 1076–77. That conclusion was based on the recognition that the extension of the referendum right to administrative actions could result in chaos for local governments. *Id.* We believe that

---

**3.** Section 5 of article XX of the Colorado Constitution, relating to home rule cities, states that "each charter shall also provide for a reference upon proper petition therefor, of measures passed by the council to a vote of the qualified electors, and for the initiative by the qualified electors of such ordinances as they may by petition request."

the reasoning set forth in *Zwerdlinger* applies equally here, and hold that, absent a specific charter provision to the contrary, a reservation of the referendum as to "measures" applies only to those measures that are legislative in character. Thus, while a city charter may extend the referendum power to matters that are purely administrative in character, the burden such an extension would place on the operation of local government makes us unwilling to read such an extension into a city charter, absent a clear statement in the charter. Contrary to plaintiffs' assertion, we do not find such a statement present here.

In addition to article IX, section 1 itself, and article III, section 6, plaintiffs rely on two other Charter provisions in asserting that "measures" in article IX, section 1, include administrative actions. The first of these, article IV, section 5, provides that

> The City Council may employ an Administrator to perform any or all administrative and executive powers and duties vested in it by this charter or by law, and may delegate to such Administrator any or all such powers and duties, subject, however, to any rights of the people of the City exercisable by initiative and referendum as in this Charter provided....

Plaintiffs argue that since the Administrator can be delegated only administrative and executive powers, "the drafters of this provision must interpret the initiative and/or referendum powers reserved by article IX to apply to administrative matters under at least some circumstances." We do not agree. First, we note that the reference in article IV, section 5, to "any rights of the people" admits to the possibility that the referendum right may not extend to the powers delegated to the Administrator. Second, it seems to us more plausible that by making delegations to the Administrator subject to the initiative and referendum rights of the people, the Charter gives the people the right to override the Council's decision to delegate one of its administrative or executive powers, rather than the right to revoke a particular administrative decision. Such a reservation would give the electors the power to prevent delega-

tion to an individual who is not directly accountable to the voters, thus helping to maintain a higher level of accountability in municipal government. Since we find this reading equally plausible to that asserted by plaintiffs, article IV, section 5, does not provide a clear statement that administrative acts are referable.

Finally, plaintiff looks to article X, section 14, to support its claim that the referendum power in article IX, section 1, extends to all administrative actions of the Council. That section, entitled TEMPORARY AND REVOCABLE PERMITS, provides that

> The Council may issue permits for the use of any portion of a street for any special occasion, temporary in its nature; and it may also issue permits, upon such terms and conditions and for such consideration or permit fee, as it may deem advisable, for the use of any portion of a public street or alley by a railroad company, motor bus company, or other carrier of persons and property, when doing so shall serve the public convenience. Provided that any such permit shall be for an indefinite period only, and be subject to revocation at the will of the Council or of the electors of the City by exercise of the initiative and referendum powers herein reserved to the electors, and provided further, that no such temporary or revocable permit shall be granted unless written consent shall be first obtained of all property owners who may be affected thereby.

Canon City Charter, art. X, sec. 14.

Plaintiffs, the Company, and the City have all suggested different interpretations for this section. However, we need not determine the precise effect of this provision to settle the issue before this court. Even if article X, section 14, does, as plaintiffs contend, grant referendum power over the arguably administrative act of granting temporary or revocable permits, it does not follow that this signifies an intent to extend the referendum power over all administrative acts. Rather, assuming, *arguen-*

*do*, that this provision grants referendum power over a single administrative act, this section does no more than establish a specific extension of the referendum power. As such, article V, section 14, provides the single, specific exception that proves the rule that, absent a clear and specific extension, the referendum applies only to legislative matters. Since we find nothing within the provisions of the Charter that would provide a similar extension to cover the case at bar, we hold that plaintiffs are not entitled to a referendum under the Canon City Charter.

### III.

Plaintiffs next contend that the district court erred in holding that the eighth amendment does not violate article XI, sections 1 and 2, of the Colorado Constitution. Section 1 provides that "[No] city ... shall ... become responsible for any debt, contract or liability of any person, company or corporation, public or private, in or out of state." Section 2 adds that "[No] city ... shall make any donation or grant to, or in aid of ... any corporation or company...." Colo. Const. art. XI, secs. 1 and 2. Plaintiffs argue that the eighth amendment violates these provisions by mingling public and private funds, by making the City "responsible for a portion of the contract or liability of the ... Company to maintain the Bridge," and by making "a donation or grant to or in aid of the ... Company." Upon analysis, we reject each of these contentions.

■ We first conclude that the City did not pledge its credit in violation of article XI. In *Denver Urban Renewal Authority v. Byrne*, 618 P.2d 1374 (Colo.1980), we held that a cooperative agreement between the Denver Urban Renewal Authority (DURA) and the City of Denver for development of the West Colfax Urban Renewal Project did not create an unconstitutional pledge of credit. The project was financed by tax-allocation bonds, issued by DURA, which would be retired, in part, through allocation to a special fund of the incremental increase in tax revenues beyond those revenues presently generated by the undeveloped property. In rejecting an argument that the development plan violated the constitutional prohibition against a governmental pledge of credit, we held that

> Denver is not indebted as a result of the tax-allocation financing scheme. The obligation incurred is solely DURA's. The DURA resolution authorizing the bonds clearly provides that only DURA is obligated to repay the bonded indebtedness, and the financing scheme bears this out.... [T]here has been no pledge of Denver's credit to DURA.

618 P.2d at 1383. The case at bar presents a precise parallel to *Byrne*. Here, the contractual obligation to third parties for the construction of the improvements to the Royal Gorge Bridge is solely that of the Company and not the City. Although the City is participating in the modernization by allocating to the project a portion of the tax and toll revenue generated by it, this does not constitute an unconstitutional pledge of the City's credit to the Company. *Byrne*, 618 P.2d at 1383.

■ We next reject plaintiffs' contention that the eighth amendment is a donation. In *Byrne*, we also held that the allocation of revenue to assist in redevelopment did not constitute a donation or grant to private individuals in violation of article XI, section 2, of the Constitution, despite the fact that private interests were indirectly benefited. *Byrne*, 618 P.2d at 1383. Thus, while the Company may be indirectly benefited by the eighth amendment, the allocation of revenue by the City to the modernization does not, as a matter of law, violate article XI, section 2, of the Constitution.

Plaintiffs' argument that the eighth amendment is somehow a donation or aid to a corporation is similarly refuted by *Perl-Mack Enterprises v. City and County of Denver*, 194 Colo. 4, 568 P.2d 468 (1977), where the developers were to construct a sewage collection system and then convey that system to Denver at no cost. The city would then not charge for its services. The court held:

Nor can the agreement be referred to in any meaningful sense as a pledge of the city's credit in aid of a private corporation, in contravention of *Colo. Const.* Art. XI, Sec. 2. The city, in exchange for Montbello's completed sewer system, promised not to charge Montbello for the services in issue.

194 Colo. at 9, 568 P.2d at 472. The court further stated that "the relationship between Perl-Mack and Denver is purely contractual and the conditions and limitations imposed by the parties are valid." *Id.* Here, as in *Perl-Mack*, there is no donation since the city has received the benefit of an improved facility with an extended life in exchange for its agreement to forego certain revenues.

■ Plaintiffs next argue that the City has violated sections 1 and 2 of article XI by mingling public and private funds. While it is true that these provisions "utterly prohibit the mingling of public moneys with those of private persons, either directly or indirectly," *Lord v. City and County of Denver*, 58 Colo. 1, 15–16, 143 P. 284, 288 (1914), there is no commingling here. Rather, the eighth amendment merely changes the payments to be made to the City under a valid lease. Unlike the situation in *Lord*, where the City and County of Denver attempted to issue bonds to help pay for the construction costs of the Moffat Tunnel, the City here has neither issued bonds to cover the expense of the improvements nor transferred any money or tax receipts to the Company. The City has simply altered its contractual entitlement to current rents in exchange for the future benefits it will receive from the modernization. *See Perl-Mack*, 194 Colo. at 9–10, 568 P.2d at 472–73 (decision to forego collection of revenues for sewer services did not violate art. XI, sec. 2, since relationship with city was purely contractual and city had neither issued bonds nor made payments for sewer construction).

■ Since the eighth amendment neither constitutes a pledge of credit or donation nor results in a commingling of municipal and private funds, the amendment does not violate article XI of the Colorado Constitution. Moreover, even if the City's decision to forego some of its entitlement to rent constituted commingling of public and private funds, the eighth amendment falls within the public purpose exception to the constitutional prohibition. *See Gude v. City of Lakewood*, 636 P.2d 691, 695 n. 2 (Colo.1981); *In re Interrogatories by the Colorado State Senate*, 193 Colo. 298, 306–07, 566 P.2d 350, 356 (1977); *McNichols v. City and County of Denver*, 131 Colo. 246, 280 P.2d 1096 (1955). The authorization of improvements to the Royal Gorge Bridge clearly serves the valid public purposes of improving and extending the life of a valuable source of municipal revenue and enhancing a major attraction that brings visitors to the City.

Plaintiffs argue that the public purpose doctrine requires that the City receive adequate consideration. They contend that, because the Company has an obligation pursuant to the Lease to modernize, as well as maintain, the bridge, the City has unconstitutionally relieved the Company of a portion of this obligation because it could have compelled the Company to modernize the bridge at no cost to the City. Leaving aside the fact that this argument is contrary to the express findings of the trial court, and assuming that the Company could have been compelled to modernize, rather than simply repair or replace, the bridge at no cost to the City, the plaintiffs' argument fails to demonstrate a constitutional violation.

In *Lyman v. Town of Bow Mar*, 188 Colo. 216, 533 P.2d 1129 (1975), the plaintiffs challenged the creation of an improvement district for the burying of overhead utility lines in which Mountain Bell and Public Service Company would be given ownership of the lines. Despite the fact that we accepted, *arguendo*, plaintiffs' contention that Mountain Bell and Public Service would receive a benefit "in the sense that they will be paid for something [that] they could have been forced to do without compensation," 188 Colo. at 224, 533 P.2d at 1143, we rejected the argument that this

ownership of the lines would create a gift to the companies contrary to article XI, section 2, of the Colorado Constitution. In concluding that the procedure for reimbursing the utilities did not violate article XI, we relied on Justice Cardozo's landmark opinion in *Oswego & Syracuse R.R. v. New York*, 226 N.Y. 351, 124 N.E. 8 (1919).

 In *Oswego* the railroad owned a bridge which needed to be removed and replaced as part of a state program to improve the navigability of the Seneca River. The state legislature provided for compensation of the railroad despite the fact that, under New York law, it could have been forced to pay for the cost of a new bridge. The court upheld this reimbursement under a constitutional provision, similar to Article XI, sections 1 and 2, which prohibited the giving or loaning of state money to or in aid of corporations. In reaching a similar conclusion in *Lyman*, we relied on the following analysis by Justice Cardozo:

> The state was about to execute a great public work. It saw that in the doing of that work there would be destruction of private property. Much of the damage would be *damnum absque injuria* [damage for which there is no legal remedy]. None the less it would be damage. The result would be inequality in the distribution of public burdens. Some would pay more dearly than others in proportion to benefits received. This inequality the Legislature, fixing in advance the conditions of the undertaking, had the power to correct. It might refuse to launch an enterprise at the price of hardship and oppression. There was power to destroy, and leave the loss where it might fall. There was also power to pay for the destruction, and thereby reestablish some uniformity of proportion between benefits and burdens. The question was for the Legislature whether the equity of compensation was strong enough to merit recognition. We cannot hold it to be illusory.

226 N.Y. at 357, 124 N.E. at 10 (quoted in *Lyman*, 188 Colo. at 224–25, 533 P.2d at 1134). We held in *Lyman* that

> Just as the railroad in *Oswego* was content with the bridge they were then using, Mountain Bell and the Public Service Company do not have any need to bury their overhead lines. If the legislature wishes to set up a procedure to reimburse the utilities for this expense, we do not believe this is a prohibited "grant or donation" under the Colorado Constitution.

188 Colo. at 225, 533 P.2d at 1134–35. Similarly, the Company here could have met its maintenance obligation without installing new technology that would both extend the useful life of the bridge and increase the value of the City's reversion at the end of the lease. Thus, the retention of revenues, which will eventually reimburse the Company for the share of the improvements that corresponds to the benefits the City will receive in 2001, does not offend article XI of the Colorado Constitution.

## IV.

Plaintiffs finally argue that the Company's affidavit was insufficient to support the findings of the trial court. They attack the trial court's recognition of a valid public purpose, contending that the finding that the improvements will extend the useful life of the bridge is not supported by admissible evidence. In their view, the Jenks affidavit upon which this finding was based was both hearsay and opinion, and therefore inadmissible. This agrument fails in three respects.

 First, plaintiffs failed to raise these objections to the sufficiency of the Jenks affidavit in the trial court. Formal defects in an affidavit are waived in the absence of a motion to strike or other objection in the trial court. *Associated Press v. Cook*, 513 F.2d 1300, 1303 (10th Cir. 1975). Unless the trial court has been given an opportunity to correct the alleged error, it will not be considered on review, and this principle applies to motions for summary judgment. *Cox v. Pearl Invest-*

ment Co., 168 Colo. 67, 71, 450 P.2d 60, 61–62 (1969); see also CRE 103(a)(1) (necessity of raising objection in the trial court). These principles apply with particular force where, as here, plaintiffs failed to controvert Jenks's affidavit with an affidavit of their own, despite being given an additional ten-day period following the court's grant of summary judgment in which to do so.

■■■■ Second, according to the affidavit, Jenks is the president of the Company, has been employed by the Company since 1952, and has personal knowledge of the matters set forth in the affidavit. In paragraph nine, Jenks states that "the life of the bridge with all of the changes is at least 50 years." We conclude that his long association with the bridge and his present position as president of the Company constitutes sufficient foundation for Jenks to testify to the life of the bridge at trial. While the accuracy of the present prediction of life expectancy may not be known for some time, it is obvious that the bridge has a present life expectancy which can be known today. The trial court could properly believe that Jenks was qualified to testify to this fact. Moreover, even if his statement regarding the life expectancy of the bridge is merely opinion, it is admissible pursuant to CRE 701, since it is (1) based on Jenks's own perception, and (2) helpful to the determination of a fact in issue.

■■■■ Third, plaintiffs, despite ample opportunity, failed to file any affidavits controverting Jenks's statement. A motion for summary judgment supported by an affidavit, to which no counter-affidavit is filed, presents no issue of fact and the court is entitled to accept the affidavit as true. Central Bank v. Robinson, 137 Colo. 409, 419, 326 P.2d 82, 88 (1958); Durnford v. City of Thornton, 29 Colo. App. 349, 354, 483 P.2d 977, 979 (1971); C.R.C.P. 56(e).

1. I concur in parts III and IV of the majority opinion.

2. The district court granted the motions for summary judgment filed by defendants Canon

For the reasons stated above, we reject plaintiffs' claim, and hold that the trial court's finding that the improvements will extend the useful life of the bridge is based on sufficient evidence. Since such findings of fact are not to be set aside unless clearly erroneous, C.R.C.P. 52(a), we reject plaintiffs' contention that this finding should be set aside here.

In conclusion, we hold both that the plaintiffs are not entitled to a referendum on the eighth amendment and that the amendment itself is not unconstitutional. Further, the findings of the trial court were based on sufficient evidence. The judgment of the district court is affirmed.

LOHR, J., concurs in part and dissents in part.

ERICKSON and DUBOFSKY, JJ., join in that concurrence and dissent.

LOHR, Justice, concurring in part and dissenting in part:

I respectfully dissent to the majority's holding concerning the issue of referendum.[1] In my opinion, the city council's approval of the eighth amendment to the lease was a legislative action and, as such, is subject to a referendum by the people under article V, section 1, of the Colorado Constitution. The judgment of the district court should be reversed and the case should be remanded for further proceedings.[2]

The people's reservation of the power of referendum in the constitution must be liberally construed in favor of the right of the people to exercise that power. Margolis v. District Court, 638 P.2d 297, 302 (Colo. 1981); Aurora v. Zwerdlinger, 194 Colo. 192, 195, 571 P.2d 1074, 1076 (1977). The majority correctly notes that article V, section 1, of the Colorado Constitution reserved the power of referendum only with respect to acts that are legislative in character. Majority op. at 449; Margolis v.

City and the Royal Gorge Company. The plaintiffs did not file a cross motion for summary judgment.

*District Court,* 638 P.2d at 302; *Aurora v. Zwerdlinger,* 194 Colo. at 194–95, 571 P.2d at 1075–76. I believe, however, that the standards governing the characterization of a governmental action as either legislative or administrative have been improperly applied to the facts by the majority, with the consequence that the result reached is incorrect.

At the outset, the majority fundamentally misconceives the nature of the action taken by the city council. By approving the amendment, the council did more than amend a lease. It decided to undertake a significant capital improvement at a cost to the city of $1.5 million. The capital improvement involves a structure that generates at present approximately $0.5 million dollars of revenue per year for the city, an amount that constitutes approximately fifteen percent of the city's budget.[3] The amount of revenue derived by the city from the bridge is projected to increase to approximately $1.5 million dollars per year by the year 2000. Moreover, the improvements are calculated to extend the life of the bridge for at least thirty-one years beyond the expiration of the lease in 2001. Approval of the lease amendment was simply the vehicle through which the city council expressed its decision to undertake this improvement and provided the mechanism by which the city will finance the improvement. The decision by the city to undertake something of such significance can only be characterized as a legislative policy decision, not merely administrative action.

As noted by the majority, one of the "tests" for determining whether an act is legislative or administrative is whether the act constitutes a declaration of public policy or whether passage of the act simply carries out existing legislative policies. Majority op. at 449; *Margolis v. District Court,* 638 P.2d at 303; *Aurora v. Zwerdlinger,* 194 Colo. at 196, 571 P.2d at 1077; 5 E. McQuillin, *Municipal Corporations,*

§ 16.55 at 194–95 (3d ed. revised 1981). In applying this standard, the plaintiffs argue that the council's action was legislative because it reversed a purported policy expressed in the lease that the city would not bear any of the costs of maintenance or modification of the bridge. The city responds, and the district court and the majority agree, that there is no merit to this argument because the lease did not require the lessee to make capital improvements to the bridge of the nature contemplated here. *See* majority op. at 451. But, this is precisely the reason why this action is legislative. Accepting the district court's reasonable construction of the lease as not requiring the lessee to make capital improvements means that the city has made a new policy decision—not expressed by the city in the lease or elsewhere before the passage of the eighth amendment—to undertake the substantial capital improvement of an important city asset. The fact that the plaintiffs do not pursue this line of reasoning—for the obvious reason that the plaintiffs object to this action by the council on the grounds that the existing lease obligated the company to undertake the improvements contemplated without contribution from the city—does not obscure the true nature of the city's action. *Cf. Citizens Against A New Jail v. Board of Supervisors,* 63 Cal.App.3d 559, 134 Cal.Rptr. 36 (1976) (proposed ordinance that would require renovation of existing county jail rather than construction of new jail was a legislative matter and therefore subject to the people's power of initiative).

Another of the "tests" for determining whether an action is legislative or administrative is whether the action relates to a subject of a permanent or general character or a subject of a temporary or special nature. Majority op. at 449–450; *Margolis v. District Court,* 638 P.2d at 303–04; *Aurora v. Zwerdlinger,* 194 Colo. at 196, 571 P.2d at 1077; 5 McQuillin, *Municipal*

---

**3.** In an affidavit attached to their response to the defendants' motions for summary judgment and at oral argument on the summary judgment motions, the plaintiffs represented that the amount of revenue derived by the city from the lease payments totalled approximately fifteen to seventeen percent of the city's budget. This is not otherwise corroborated. However, the city did not protest this representation, and it is accepted for the purposes of this dissent.

*Corporations,* § 16.55 at 194.[4] Applying this standard to the facts, the majority concludes that the passage of the lease amendment at issue is "clearly an administrative act," majority op. at 450, because it relates to the amendment of a lease with a fixed termination date and because it limits the reduction in tolls to a period during the existing lease term necessary for the lessee to recoup the portion of the improvement costs to be borne by the city, majority op. at 450. The majority's analysis is unpersuasive. This is not simply a lease amendment with little effect beyond the life of a relatively short leasehold. Instead, the lease amendment is a financing mechanism by which the city has committed itself to acquire and pay for a capital improvement of vast significance to the affairs of the city, its people and its government—an improvement that will have a life and an effect for at least thirty years beyond the life of the existing lease. This is not an action of a temporary or special character, and the duration of its impact should not be measured solely by the time in which the bridge will generate sufficient income to cover the costs of the improvements. It is a legislative act of a substantial and general nature, having a long-term impact on city finances. This is hardly comparable to a decision concerning "a contract for professional services or for a roof on a police station." *See* majority op. at 450.[5]

Whether a city's decision to construct, modify or purchase any particular improvement is legislative or administrative is a difficult question, and the courts of this nation have not always taken consistent or reconcilable positions when confronted with these situations. *See* 5 McQuillin, *Municipal Corporations,* §§ 16.55 to 16.59; 13 E. McQuillin, *Municipal Corporations,* §§ 37.56, 37.80 (3d ed. revised 1971). Because the proper characterization of each such decision is so dependent upon facts concerning the characteristics of each improvement and the context in which the improvement is to be made, it would be unwise to hold as a matter of law that every governmental decision to undertake a capital improvement is a legislative act. However, under the circumstances presented here, it must be concluded that the decision by the City Council of Canon City to undertake the contemplated improvements to the Royal Gorge Bridge was a declaration of public policy that will have an impact for years to come and therefore was a legislative act, subject to referendum under article V, section 1, of the Colorado Constitution. Accordingly, it is not necessary to consider whether the council's decision is also subject to referendum under article IX, section 1, of the City Charter of Canon City or whether the referendum power under the city charter is more expansive than that reserved to the people under the Colorado Constitution. *See City of Aurora v. Zwerdlinger,* 194 Colo. at 195, 571 P.2d at 1076.

The judgment of the district court should be reversed and the case remanded.

**4.** If an act is deemed to be legislative under one of the first two "tests" outlined in the majority opinion and in *Margolis* and *Zwerdlinger,* it is unclear whether that act must be examined under the other "test" and what the consequences would be if, under this second "test," a contrary conclusion is reached. The interrelation between the first two tests has never been explained in our decisions. This uncertainty need not be addressed here, for the city's action is legislative when measured against either of the first two tests.

**5.** Because the council's action is legislative when measured against the first two "tests," there is no reason to apply the majority's third "test," which provides that if an original act is legislative, an amendment to that act is also legislative. *See* majority op. at 450, 451. In articulating this third "test," the majority may have overstated our holding in *Margolis v. District Court, see* 638 P.2d at 304, which was simply that "rezoning decisions—no matter what the size of the parcel of land involved—are legislative in character and subject to [referendum under the Colorado Constitution]." *Id.* at 304. There is much in *Margolis* to suggest that this conclusion in the rezoning context may not be read expansively as a ruling that any amendment to a legislative act is also necessarily legislative. As there is no need to apply the third test, there is no reason to explore this issue further.

I am authorized to say that ERICKSON and DUBOFSKY, JJ., join in this concurrence and dissent.